IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 22-CR-30102-DWD |
| | ) |
| DONALD PERKINS, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM & ORDER

**DUGAN, District Judge:**

This matter comes before the Court on the Defendant's Motion to Dismiss Count III of the indictment (Doc. 57)[1] and Motion to Withdraw Guilty Plea (Doc. 78). The question presented now is whether, in the wake of the teachings of *New York State Rifle & Pistol Association, Inc. v Bruen*, 14 S. Ct. 2111 (2022), Title 18, United States Code, Section 922(g)(1), which prohibits possession of a firearm by a felon, violates the Second Amendment. U.S. CONST. AMEND. II. The Court, for the reasons stated below, finds that §922(g)(1) does not violate the Second Amendment.

### I. BACKGROUND

On September 20, 2022, Donald Perkins was indicted on four counts. Pertinent here is Count III of the indictment which charges him with knowingly possessing a Ruger

---

[1] Defendant's motion is in the form of a "Memorandum in Support of Motion to Dismiss the Indictment as Violative of the Second Amendment Count 3". The Court takes this filing as the Defendant's Motion to Dismiss.

firearm when he knew that he had been convicted of a crime punishable by imprisonment for a term exceeding one year in violation of §922(g)(1). On May 3, 2023, Perkins pled guilty to all counts including Count III. (Doc. 45). On August 2, 2023, he filed the instant motion.[2]

The sole basis for Defendant's Motion to Withdraw Guilty Plea is the belief that §922(g)(1) is unconstitutional under the Second Amendment, as interpreted in *Bruen*. (Doc. 57, P. 1). Likewise, in his Motion to Dismiss the Indictment, Defendant claims § 922(g)(1) operates to categorically deny his rights under the Second Amendment simply because he was once convicted of a crime for which he could have been imprisoned for more than a year. In Response, the Government disagrees that § 922(g)(1) offends the Second Amendment.

## II. DISCUSSION

Section 922(g)(1), in part, provides: "It shall be unlawful for any person…who has been convicted in any court of[] a crime punishable by imprisonment for a term exceeding one year…to…possess in or affecting commerce, any firearm or ammunition." 18 U.S.C. § 922(g)(1). Section 922(g)(1) does not distinguish between violent felonies and non-violent felonies. *See id*. Nor does the Second Amendment to the Constitution, which states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear arms, shall not be infringed." U.S. CONST. AMEND. II.

---

[2] See *Class v. United States*, 138 S. Ct. 798, 803, 200 L. Ed. 2d 37 (2018) (A guilty plea does not by itself bar a federal criminal defendant from challenging the constitutionality of the statute of conviction).

In the last decade or so, much scholarly attention has been paid to the meaning of the words found in the Second Amendment. There is no dearth of recent judicial consideration of both historical and contemporary writings in an effort to understand the import of those words. Given the nature of the analysis required of district courts by *Bruen*, more can be expected. The increase in the number of contests over the constitutionality of § 922(g)(1) is due, at least in part, to the fact that the "means-end scrutiny," such as strict or intermediate scrutiny, does not apply in the Second Amendment context, requiring the Government to affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms. *See Bruen*, 597 U.S. at 19. As the Supreme Court emphasized in *Bruen*:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Id*. at 24 (citing *Konigsberg v. State Bar of California*, 366 U.S. 36, 50 n. 10 (1961)).

While *Bruen* addressed the constitutional right of a citizen to carry a handgun in public, the issue presented here—namely, whether a prohibition of the possession of firearms by a felon violates the Second Amendment—is entitled to the same historical analysis. *See Atkinson v. Garland*, 70 F.4th 1018, 1022 (7th Cir. 2023) (finding, since the parties did not grapple with *Bruen*, "[t]he best way forward…[wa]s to return the case to the district court for a proper, fulsome analysis of the historical tradition supporting § 922(g)(1)").

### A. The Text of the Second Amendment to the Constitution

Defendant first argues he is a person who is included in the term "people," as used in the Second Amendment. The Government, wisely, does not appear to contest this proposition. The phrase "the people" is used in notable places throughout the Constitution, and it "refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." *See District of Columbia v. Heller*, 554 U.S. 570, 580 (2008) (quoting *U.S. v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990)). And, as was emphasized in *Heller*, in all six other provisions of the Constitution mentioning "the people," the term unambiguously refers to all members of the political community, not an unspecified subset. *Id*. Accordingly, there is a "strong presumption that the Second Amendment right is exercised individually and belongs to all Americans." *Id*. at 581. The record in this case reflects that Defendant is an American citizen and, therefore, that he is to be afforded the rights available under the Second Amendment. (Doc. 52, pg. 5).

Defendant also argues the term "arms," as used in the Second Amendment, includes the Ruger handgun that was found in his possession and that serves as the basis for his conviction. Again, the Government appropriately makes no contrary argument. The 18th-Century meaning of the term "arms" is no different than the meaning of that term today. *See Heller*, 554 U.S. at 581. An "important" legal dictionary from 1771 defined "arms" as "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." *Id*. (quoting 1 A New and Complete Law Dictionary; citing N. Webster, American Dictionary of the English Language (1828) (reprinted 1989)).

4

Handheld firearms date back to as early as the 17th Century and were common during the years of ratification. Clearly, the Ruger handgun found in Defendant's possession is within the term "arms," as used in the Second Amendment. *See id*. at 582 ("Just as the First Amendment protects modern forms of communications, [citation], and the Fourth Amendment applies to modern forms of search, [citation], the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding.").

It follows, then, that the Second Amendment presumptively protects the activity of possessing a handgun, and that finding is consistent with *Heller*. However, § 922(g)(1) excludes from that otherwise protected activity those who have been convicted of a crime punishable by more than one year. *See* 18 U.S.C. § 922(g)(1). The potential problem for § 922(g)(1) lies in the fact that its regulation of the Second Amendment right began nearly 200 years after Ratification. *See Bruen*, 597 U.S. at 19 (" '[P]ost-ratification adoption or acceptance of laws that are inconsistent with the original meaning of the constitutional text obviously cannot overcome or alter that text.' ") (quoting *Heller v. District of Columbia*, 670 F.3d 1244, 1274 n. 6 (D.C. Cir. 2011) (Kavanaugh, J., dissenting)). Accordingly, the Government must justify the regulatory weight of § 922(g)(1) "by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation," and "[o]nly then may [the] court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.' " *Id*. at 24. (citing *Konigsberg*, 366 U.S. at 50 n. 10).

### B. *Bruen's* Historical Analysis for Justifying the Regulation of Second Amendment Activities

5

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. AMEND. II. And, importantly, "[t]here seems…no doubt, on the basis of both text and history, that the Second Amendment conferred an individual right to keep and bear arms. Of course the right was not unlimited." *Heller*, 554 U.S. at 595. As alluded to above, whether a regulation interferes with that individual right "requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." *Bruen*, 597 U.S. at 26. *Bruen* teaches:

> When confronting such present-day firearm regulations, this historical inquiry that courts must conduct will often involve reasoning by analogy…. Like all analogical reasoning, determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are "relevantly similar."

*See id*. at 28-29 (citing C. Sunstein, On Analogical Reasoning, 106 Harv. L. Rev. 741, 773 (1993)).

Therefore, historical sources must be sifted through and examined in the search to find reliable indicia of our forefathers' most probable intellectual reactions to the modern regulation or law in question. This process necessarily entails a quarry of analogous, but not entirely identical, legislative artifacts that help to determine the scope of the right, as understood by those who adopted the Amendment. This effort is not without perils, as "applying constitutional principles to novel modern conditions can be difficult and leave close questions at the margins." *Heller*, 670 F.3d at 1275 (Kavanaugh, J., dissenting)).

The history of the right to keep and bear arms—before, during, and after the Founding Era—confirms that certain categories of individuals were deemed ineligible to

6

enjoy the right. *See U.S. v. Rahimi*, 2023 WL 5322645, Brief for the United States, pg. 7. English law allowed the government to disarm individuals who were "dangerous" or not "peaceable." *See id*. Second Amendment precursors proposed during the Founding Era guaranteed the right to keep and bear arms only to "honest and lawful" citizens or to those who posed no "danger of public injury." *See id*. Also, commentators in the 19th Century recognized that the government's authority to disarm individuals who were not "orderly," "peaceable," or "well-disposed." *See id*.

Tradition confirms that reading of the Second Amendment. *See id*. American legislatures have long disarmed individuals who they have found to be dangerous, irresponsible, or otherwise unfit to possess arms. For example, during the Revolutionary War, the Continental Congress recommended, and many States adopted, laws disarming loyalists. *See id*. States in the 19th Century disarmed minors, intoxicated persons, and vagrants. *See id*. In addition, Congress in the 20th Century disarmed felons and persons with mental illnesses. *See id*. Although different statutes disqualified different groups at different times, they reflect the same enduring principle: Legislatures may disarm those who are not law-abiding, responsible citizens. *See id*.

In determining the scope of the right to keep and bear arms, a court should consider the right's history and the Nation's tradition of firearm regulation. *See Bruen*, 597 U.S. at 24. History and tradition establish, for example, that the Second Amendment does not guarantee an unlimited right to possess every kind of weapon; rather, Congress may ban "dangerous and unusual weapons." *See Heller*, 554 U.S. at 627 (citing, among other authorities, 4 Blackstone 148-49 (1769); 3 B. Wilson, Works of the Honourable James

7

Wilson 79 (1804); J. Dunlap, The New–York Justice 8 (1815); C. Humphreys, A Compendium of the Common Law in Force in Kentucky 482 (1822); 1 W. Russell, A Treatise on Crimes and Indictable Misdemeanors 271–272 (1831); H. Stephen, Summary of the Criminal Law 48 (1840); E. Lewis, An Abridgment of the Criminal Law of the United States 64 (1847); F. Wharton, A Treatise on the Criminal Law of the United States 726 (1852)). If there was anything that all the *Heller* Justices agreed upon (and there is not much) it is that the right to keep and bear arms in England was subject to restriction by Parliament. *See id*. at 593, 664-65. History and tradition similarly establish that the Second Amendment does not guarantee an unlimited right to carry weapons in every kind of place; rather, Congress may ban weapons in "sensitive places." *Bruen*, 597 U.S. at 30-31.

Logic would suggest that if Congress can restrict the kind of weapon a citizen may possess and where he might possess that weapon, it may also regulate who may possess weapons in the first place. However, that sort of logic is not enough under *Bruen*. The inadequacy of such logic allows for the making of ambiguous connections between "relevantly similar" regulations instead of showing something more akin to a lineage of "distinctly similar" laws over time. *See id*. at 26-29. Certainly, evidence of the long-held understanding of the meaning of the Second Amendment serves the historical analysis.

The Supreme Court has suggested, at least implicitly, that Congress may disarm individuals who are not "law-abiding, responsible citizens."[3] *See Heller*, 554 U.S. at 635. More specifically, our Supreme Court described the right to keep and bear arms as a

---

[3] *See also Bruen*, generally (identifying many variations of "law abiding, responsible citizens" who enjoy the Second Amendment right).

8

"*right* of law-abiding, responsible citizens." *See id*. (Emphasis added). *Heller* also suggests that legislatures may adopt categorical prohibitions on the possession of arms by those who are not law-abiding and responsible, identifying "longstanding prohibitions on the possession of firearms by felons and the mentally ill" as "examples" of "presumptively lawful regulatory measures." *See id*. at 626-27 n. 26. Then, just two years after *Heller*, the Court made clear that its holding did not cast doubt on longstanding regulatory measures, such as "prohibitions on the possession of firearms by felons and the mentally ill." *See McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 786 (7th Cir. 2010)).

Even with the Court's implicit expression of its view on the issue of the ability of Congress to restrict the firearm rights of felons, it remains appropriate, at least presently, to look to the history surrounding the Second Amendment's genesis, adoption, and recognized limitations during the Founding Era. *See Bruen*, 597 U.S. at 20-22. Because the Second Amendment "codified a right inherited from our English ancestors," a court should begin with English law. *See id*. at 20 (citing *Heller*, 554 U.S. at 599). Since "[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them," a court should also consider how those in the Founding Era understood the Second Amendment. *See id*. at 34 (quoting *Heller*, 554 U.S. at 554) (Emphasis omitted). Also, "the public understanding of a legal text in the period after its enactment or ratification" is evidence of that understanding and is appropriately examined. *See id*. at 20 (quoting *Heller*, 554 U.S. at 605) (Emphasis omitted).

Following the Glorious Revolution, the British Bill of Rights codified in 1689 the notion that "the Subjects which are Protestants[] may have arms for their defence suitable

to their conditions and as allowed by law." *See Heller*, 554 U.S. at 592-93 (quoting 1 W. & M., ch. 2, § 7, in 3 Eng. Stat. at Large 441 (1689); *accord Bruen*, 597 U.S. at 44-45.[4] Interestingly, as this quotation suggests, whatever right was conferred on English subjects by the Bill of Rights was conferred on only Protestant subjects. Some contend that only the protestants were included because King James II had disarmed "several good subjects being Protestants." *See Heller*, 554 U.S. at 664 (Stevens, J., dissenting).

While the Bill of Rights may have prohibited the disarming of "good subjects," it allowed the disarming of "dangerous" ones. The Bill of Rights left intact the Militia Act of 1662, which authorized local officials to disarm individuals they judged "dangerous to the Peace of the Kingdome." Militia Act of 1662, 13 & 14 Car. 2, c. 3, § 13 (1662)). Consistent with the Militia Act, the Crown often directed local officials to disarm those whom it did not trust to use weapons responsibly, *e.g.*, those who had "disturbed the public Peace."[5] That practice continued after the adoption of the English Bill of Rights. Indeed, it has been observed that many 18th Century justice-of-the-peace manuals noted the Militia Act authorized local officials to disarm those who were "judge[d]

---

[4]The Court recognizes that there exists a camp of those with differing views on the origin of our Second Amendment. "If the Americans did grant an individual right to arms, as the United States Supreme Court ruled, they got that idea from someplace other than the 1689 English Bill of Rights." Lois G. Schwoerer, Gun Culture in Early Modern England, pg. 170 (2016).

[5]Privy Council to Lord Newport (Jan. 8, 1661), *Transactions of the Shropshire Archaeological and Natural History Society*, pt. 2, 3d ser., vol. 4, at 156 (1904); *See also, e.g., Calendar of State Papers, Domestic Series, Charles II, 1661-1662,* at 538 (Nov. 1, 1662) (Mary Anne Everett Green ed., 1861) (instructions to "cause good watch to be kept in the highways" and to disarm "such as travel with unusual arms at unseasonable hours"); *Calendar of State Papers, Domestic Series, 1670,* at 237 (May 26, 1670) (Mary Anne Everett Green ed., 1895) (instructions to disarm "dangerous and disaffected persons"); *Calendar of State Papers, Domestic Series, May 1, 1684–February 5, 1685,* at 26 (May 20, 1684) (F.H. Blackburne Daniell & Francis Bickley eds., 1938) (instructions to dispose of arms seized from "dangerous and disaffected persons"); *U.S. v. Rahimi*, 2023 WL 5322645, Brief for the United States, pg. 15.

dangerous."[6]

The *Heller* Court determined "[t]his right [conferred by the English Bill of Rights] has long been understood to be the predecessor to our Second Amendment. *See Heller*, 554 U.S. at 593 (citing E. Dumbauld, The Bill of Rights and What It Means Today, pg. 51 (1957); W. Rawle, A View of the Constitution of the United States of America, pg. 122 (1825)). So, while the English Bill of Rights conferred a right to possess arms to English subjects, the government could (and did) disarm those who were perceived to be dangerous or who could not be trusted to use arms lawfully. It would seem to follow, then, that the Second Amendment does not necessarily prevent Congress from limiting access to weapons to those who are not dangerous and who are law-abiding.

Notably, there is no shortage of Founding Era regulations disarming a group of people who were deemed ineligible to enjoy the right to keep and bear arms. In March 1776, the Continental Congress resolved that the Colonies "immediately cause all persons to be disarmed within their respective colonies, who are notoriously disaffected to the cause of America, or who have not associated or who refuse to associate…against the hostile attempts of the British." 4 Journals of the Continental Congress, 1774-1789, pgs. 201-205 (1906). Following ratification, many of the states promulgated laws addressing the right to bear arms. In 1780, the town of Williamsburg proposed amending the newly drafted Massachusetts constitution to provide that "the people have a right to keep and

---

[6]Robert Gardiner, *The Compleat Constable* 68 (3d ed. 1708); see, *e.g.,* Giles Jacob, *The Modern Justice* 338 (1716); W. Nelson, *The Office and Authority of a Justice of Peace* 464 (7th ed. 1721); G. Jacob, *Lex Constitutionis* 331 (2d ed. 1737); Theodore Barlow, *The Justice of Peace* 367 (1745); 2 Joseph Shaw, *The Practical Justice of Peace, and Parish and Ward-Officer* 231 (6th ed. 1756); *U.S. v. Rahimi*, 2023 WL 5322645, Brief for the United States, pg. 15.

bear Arms for their Own and the Common defence." *See U.S. v. Rahimi*, 2023 WL 5322645, Brief for the United States, pgs. 16-17 (quoting *The Popular Sources of Political Authority: Documents on the Massachusetts Constitution of 1780*, pg. 624 (Oscar Handlin & Mary Handlin eds., 1966)). The town explained: "we esteem it an essential priviledge to keep Arms in Our houses for Our Own Defence and while we Continue honest and Law-full Subjects of Government we Ought Never to be deprived of them." *See id*. at 17.

Anti-Federalists expressed a similar understanding of the right at Pennsylvania's ratifying convention. They proposed a bill of rights that, *inter alia*, forbade "disarming the people, or any of them, unless for crimes committed, or real danger of public injury from individuals." *See id*. at 17 (quoting 2 *The Documentary History of the Ratification of the Constitution (Documentary History)* 598 (Merrill Jensen ed., 1976); *Ratification: The People Debate the Constitution, 1787-1788*, pgs. 118-19 (Pauline Maier, 2011). The Federalists defeated the proposal, but the Anti-Federalists published it in the Dissent of the Minority of the Convention, which was widely read and "highly influential." *See id*. (quoting *Heller*, 554 U.S. at 604, 624).

Samuel Adams also proposed a bill of rights that would have denied Congress the power "to prevent the people of the United States, who are peaceable citizens, from keeping their own arms." *See id*. at 17-18 (quoting 6 *Documentary History* 1453 (John P. Kaminski & Gaspare J. Saladino eds., 2000). A contemporary described the proposal as an effort to protect "the right of peaceable citizens to bear arms." *See id*. at 18 (quoting Letter from Jeremy Belknap to Ebenezer Hazard (Feb. 10, 1788), in 7 *Documentary History* 1583 (John P. Kaminski & Gaspare J. Saladino eds., 2001)). The convention rejected the

proposal, but only because Adams presented it on the morning of ratification. *See id*.

### C. Application to Defendant

The Government, in its Response, asserts the history is replete with representative analogues for § 922(g)(1) that shed light on the scope of the Second Amendment. It goes on to conduct a survey of a variety of English rule, Ratification and post-Ratification Era regulations for the proposition that the Second Amendment does not prevent Congress from limiting the firearm rights of a felon. (Doc. 59). For example, the Government asserts Colonial America disarmed classes of people who were viewed as "untrustworthy" because of concerns that members of those classes failed to demonstrate compliance with the law. (Doc. 59, p. 7). The Government also points to examples of law that limited the right to keep and bear arms even during the course of the Revolution. (Doc. 59, p. 8). A 1775 Connecticut law provided that any person convicted of the offense of libeling or defaming any act or resolves of the Continental Congress be disarmed and not be allowed to keep any arms. (Doc. 59, p. 9). While likely to fail against almost any present-day constitutional scrutiny, such laws do demonstrate the understanding at the time of the Revolution that those who pose a threat to the government, or its people or laws, would be disarmed.

Defendant suggests the Court must be careful not to simply brush past the requirement that the comparator laws of the past be "distinctly similar" and not just "relevantly similar" to § 922(g)(1). (Doc. 57, p. 8). Defendant suggests, "[t]o the extent that courts have thus far rejected Constitutional challenges after *Bruen*, they have misapplied

the new standard by using analogical reasoning instead of the 'distinctly similar' standard for any problem that has persisted since the 18th Century." (Doc. 57, pgs. 8-9) However, the Government has presented to the Court numerous examples in our history where laws, regulations, and resolutions, denying members of certain groups the right to keep and bear arms, were passed from the times before and during our separating from England, during the colonial periods, and through the Ratification and post-Ratification Eras. Many of these examples are much more than merely analogous. There are ample "distinctly similar" historical exemplars and models that demonstrate individually, and certainly collectively, that regulations disarming disloyal or even merely untrustworthy individuals were not uncommon in the early history of our Country.[7] The Court believes the Government has carried its burden by showing the Nation's historical tradition of firearm regulation, and even outright prohibition, against the use or possession of firearms by individuals perceived or deemed to be dangerous, untrustworthy, or criminal. *See Bruen*, 597 U.S. at 24. With that said, the Court finds, as others before it have, that § 922(g)(1) is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms under the Second Amendment. *See id*. at 19.[8]

### III. CONCLUSION

---

[7] For a thorough examination of the regulations and laws limiting the right to keep and bear arms to "law-abiding" citizens in the 19th and 20th centuries, see *U.S. v. Rahimi*, 2023 WL 5322645, Brief for the United States.

[8] *See U.S. v. Coleman*, No. 22-cr-87, 2023 WL 6690935, *2 (E.D. Virg. Oct. 12, 2023) (observing, as of October 12, 2023, in over 172 cases nationwide, facial and as-applied challenges to the constitutionality of § 922(g)(1) have been rejected under *Bruen's* text-and-history approach); *see also* Exhibit 1 to the Government's Response to Defendant's Motion to Dismiss (Doc. 56-1) (providing a list of federal district court rulings that have upheld the constitutionality of § 922(g)(1) post-*Bruen*).

Accordingly, the Court **FINDS** § 922(g)(1) does not violate the Second Amendment or, by extension, Defendant's rights, as applied. Because Defendant's Motion to Dismiss (Docs. 57) and Motion to Withdraw Guilty Plea are based entirely upon § 922(g)(1)'s constitutionality, those Motions are **DENIED**.

**SO ORDERED.**

Dated: December 22, 2023                          /s *David W. Dugan*

                                                 _____
                                                 DAVID W. DUGAN
                                                 United States District Judge